UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY D. RAPER, SR.,

                Plaintiff,

v.

JOSEPH V. CONTRONEO, *et al.*,

                Defendants.

_____/

Case No. 1:17-cv-368

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a prisoner in the custody of the

Michigan Department of Corrections (MDOC). This matter is now before the Court on

"Defendants Lynn Larson, D.O. and Terrance Whiteman, M.D.'s Motion for summary judgment

based solely on the failure to exhaust administrative remedies" (ECF No. 22).

## I.       Background

The Court summarized plaintiff's claims in pertinent part as follows:

> Plaintiff Larry D. Raper presently is incarcerated with the Michigan
> Department of Corrections (MDOC) at the Boyer Road Correctional Facility in
> Carson City, Michigan, which has been consolidated with the Carson City
> Correctional Facility (DRF) and is now referred to as DRF-West. The actions about
> which he complains also occurred while he was housed at the Duane Waters
> Hospital (DWH), operated by the MDOC. He sues the following Defendants: the
> MDOC; Dr. Joseph V. Cotroneo, who is a surgeon at the McLaren Hospital of
> Greater Lansing; DWH Doctors Lynn M. Larson and Terence Whiteman; and other
> unknown medical staff at DWH (Unknown Part(y)(ies)).
>
> Plaintiff complains that, for over 15 years, doctors within the MDOC had
> been aware of his problems with the circulation in his legs. He broadly alleges that
> unnamed persons disregarded the problems for years.

On April 27, 2015, Dr. Cotroneo performed surgery at McLaren Hospital, placing a graft in Plaintiff's right groin to improve blood flow to Plaintiff's legs. The surgery had a number of complications, including a blood clot that moved toward Plaintiff's heart and ultimately caused a heart attack. Plaintiff alleges that the blood clot undoubtedly was the result of medications that he had been prescribed for years, of which Dr. Cotroneo should have known.

Plaintiff was transferred to DWH on May 4, 2015, where he was placed under the care of Dr. Rashed Bashir, who is not a Defendant in the action. Plaintiff was discharged from DWH and returned to DRF-West on May 13 or 14, 2015. Over the next two weeks, Plaintiff contracted MRSA, either in his cell or in the health care center at DWH-West. Plaintiff was readmitted at McLaren Hospital on May 31, 2015, and again placed under the care of Defendant Dr. Cotroneo. On June 2, 2015, Dr. Cotroneo operated to clean out the infected area. Dr. Cotroneo debrided the wound abcess and excised parts of the muscle areas to remove the pus and necrotic tissue. Dr. Cotroneo, however, did not remove the graft that was placed in April. Plaintiff alleges that Defendant Cotroneo should have known that the graft needed to be removed at that time.

Plaintiff was transferred to DWH and placed under the care of Defendant Dr. Larson from about June 15, 2015 to approximately August 3 or 4, 2015. Plaintiff claims that Dr. Larson visited him only 10 to 18 times during this period. He also alleges that, in an attempt to save money, Defendant Larson used a different kind of dressing and packed the wound, rather than using the type of dressing ordered by Dr. Cotroneo. Plaintiff began to bleed from his wound at about 8:30 p.m. on August 3 or 4, 2015. After he was cleaned up, the nurses were instructed to check on Plaintiff every hour, to ensure that he had not started to bleed again. Plaintiff alleges that he did not receive the necessary care and that Defendant Larson ignored signs of infection. Plaintiff was scheduled to be discharged from DWH on August 6, 2015.

On August 6, 2015, Plaintiff suddenly began to bleed profusely from a ruptured artery. He was rushed by ambulance to the Allegiance Health emergency room. Defendant Dr. Whiteman directed care during the transfer, and he had to place 80 pounds of weight on Plaintiff's groin area to control the bleeding. At Allegiance Health, Plaintiff was placed in the care of Dr. Praveen Balraj (not a Defendant), who performed surgery to remove the graft and the infection growing under the skin. However, because of the absence of sufficient blood flow, Dr. Balraj was forced to amputate Plaintiff's right leg below the knee.

Since the amputation, Plaintiff continues to experience problems. Unspecified persons have not adequately provided assistance with his prosthetic device and have denied pain relief. In addition, since arriving back at DRF-West, Dr. Scott Holmes (not a Defendant) has denied him an air mattress, despite the fact that Plaintiff was prescribed an air mattress at DWH. Plaintiff also is being denied a pillow to place under his stub and between his legs during sleep.

Plaintiff argues that Defendant Cotroneo should have removed the graft during the June 2, 2015, surgery and that Cotroneo therefore is responsible for Plaintiff's ultimate loss of his leg. He also asserts that the DWH and DRF-West Defendants should have known of his infection sooner, before it caused him to lose his right lower leg. Plaintiff further argues that Defendants DWH and DRF-West do not adequately clean their facilities and do not use bleach in those cleanings, leading to Plaintiff becoming infected with the MRSA virus. In addition, he contends that Defendant Larson caused his infection by not checking on him more frequently and by using an improper form of dressing.

For relief, Plaintiff seeks compensatory damages in the amount of $750,000.00 and punitive damages of $850,000.00 from the individual Defendants and $5 million from the MDOC.

Opinion (ECF No. 17, PageID.90-92).

The Court apparently construed plaintiff's claim as alleging deliberate indifference to a serious medical need in violation of the Eighth Amendment and ordered service of the complaint on defendants Dr. Larson and Dr. Whiteman.[1]  These two doctors have moved for summary judgment for lack of exhaustion.

## II.    Defendants' motion for summary judgment

### A.    Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

[1] The Court notes that Dr. Controneo and the MDOC were dismissed on initial screening and that plaintiff has not identified the unknown parties listed in the complaint caption as "entire medical staff at the Duane L. Waters Health Center."

3

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### B.     Failure to Exhaust

### 1.     Exhaustion requirement

The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

4

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2.    MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007).  A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P.  If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R.  The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely.  Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how).  Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original).  The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V.  If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB.  Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3.    Discussion

Defendants point out that plaintiff filed two grievances which relate to his claim, DRF-1608-2074-12D ("2074") and DRF-1702-0333-28A ("333").  Defendants' Brief (ECF No. 22, PageID.117).  In Grievance 2074, plaintiff stated in pertinent part that "[t]his grievance is dealing mainly with Duane Waters Hospital there in Jackson, and their overall negligence in my treatment of my right leg, mainly Dr. Larson."  Grievance 2074 (ECF No. 22-1, PageID.134).  The Step I response addressed the merits of plaintiff's grievance, noting that "[t]he grievant was interviewed and the EMR [electronic medical record] reviewed," summarizing the EMR (including plaintiff's surgery), and finding in part that "no evidence to support the grievant's claim of negligence."  *Id*. at PageID.135.  Similarly, in denying the appeal, the Step II response summarized the "STEP II INVESTIGATION" as including a review of the EMR, a determination that "[d]ocumentation revealed grievant was provided timely and appropriate care for his medical condition," and noting that "[a]s the step one responder indicated, with any surgery there are many possible complications."  *Id*. at PageID.133.  However, the grievance was rejected at Step III because "there is no indication the grievant attempted to resolve this issue prior to filing this grievance as outlined in policy," and that plaintiff's statement that the condition "is ongoing" was "not consistent with the requirements outlined within PD 03.02.130."  *Id*. at PageID.131.  In short, the MDOC rejected the grievance at Step III, despite the fact that MDOC personnel investigated the merits of the grievance at both Steps I and II, and concluded that there was no evidence to support plaintiff's claims.  Under these circumstances, defendants waived the procedural defect noted at Step III when they addressed the merits of the grievance at Steps I and II.  *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 325 (6th Cir. 2010) ("When prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits, so as

6

a general rule will we.").  Accordingly, the Court concludes that plaintiff properly exhausted a claim against Dr. Larson.

The next question is whether plaintiff properly exhausted a claim against Dr. Whiteman.   In Grievance 333, plaintiff named Dr. Larson, Dr. Whiteman, and former defendant Dr. Controneo.  Grievance 333 (ECF No. 22-1, PageID.127).  This grievance was rejected at Step I as duplicative of Grievance 2074 and untimely filed.  *Id*.  Based on this rejection, plaintiff did not properly exhaust Grievance 333.  *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93.  Nevertheless, for the reasons stated below, the Court concludes that plaintiff did properly exhaust a grievance against Dr. Whiteman.

In reviewing the issue of exhaustion, "it is sufficient for a court to find that a prisoner's [grievance] gave prison officials fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint."  *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006).  Such is the case here with respect to plaintiff's claim against Dr. Whiteman.  When the MDOC rejected Grievance 333 as duplicative of Grievance 2074, it necessarily construed the subject matter of Grievance 333 to be the same as the subject matter of Grievance 2074.[2]  If plaintiff had presented new subject matter in Grievance 333, then it would not have been "duplicative" of Grievance 2074.  By making that determination, the MDOC found that both Grievance 333 and Grievance 2074 included the claims against the three individuals named in Grievance 333, i.e., Dr. Larson, Dr. Whiteman, and Dr. Controneo.  In summary, by rejecting Grievance 333 as duplicative of Grievance 2074, the MDOC effectively waived the procedural defect that plaintiff failed to name Dr. Whiteman in Grievance 2074.  Finally, the fact that Grievance 333 was also rejected as untimely does not change this result

---

[2] The definitions of "duplicative" include "facsimile, replica, reproduction."  *The Random House Dictionary of the English Language* at p. 443 (1973).

7

because Grievance 2074 was timely filed.  Based on this record, the Court concludes that plaintiff properly exhausted his claim against Dr. Whiteman and prison officials had fair notice of the alleged mistreatment that formed the basis of plaintiff's claim regarding the amputation of his leg. *See Bell*, 450 F.3d at 654.

### IV.    Recommendation

For these reasons, I respectfully recommend that defendants' motion for summary judgment on the basis of exhaustion (ECF No. 22) be **DENIED**.

Dated:   May 14, 2018                              /s/ Ray Kent
                                                            United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).