UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY D. RAPER,

Plaintiff,

v.

JOSEPH V. COTRONEO, *et al.*,

Defendants.
_____________________________/

Case No. 1:17-cv-368

Hon. Paul L. Maloney

**REPORT AND RECOMMENDATION**

This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on defendants Lynn Larson, D.O. and Terence Whiteman, M.D.'s Motion for summary judgment (ECF No. 74).

**I. Background**

Plaintiff has a number of medical conditions. On April 27, 2015, while plaintiff was a prisoner at the Carson City Correctional Facility (DRF)[1], he underwent surgery at the McLaren Greater Lansing Hospital ("McLaren Hospital"). The surgeon, former defendant Joseph V. Cotroneo, M.D., inserted a graft in plaintiff's right groin to improve the blood flow to his legs. There were complications with the surgery including a blood clot. After the surgery, during May 2015, plaintiff spent some time recovering at the MDOC's Duane Waters Health Center (DWH). Plaintiff contracted an infection. On June 2, 2015, Dr. Cotroneo operated on plaintiff to clean out the infected area. Plaintiff believes that Dr. Cotroneo should have removed the graft at that time. After the operation, plaintiff was sent to DWH, where he commenced treatment in June, July and

[1]At the time of these incidents, Boyer Road Correctional Facility in Carson City, Michigan, was consolidated with the Carson City Correctional Facility (DRF) and is referred to as DRF-West. *See* Opinion (ECF No. 17, PageID.90).

August 2015. A few days before his scheduled discharge, plaintiff began to bleed from the wound. On August 5, 2015, plaintiff's groin started to bleed profusely, he was sent to an emergency room, and admitted to Henry Ford Hospital the next day. Plaintiff was diagnosed with an "infected right groin pseudoaneurysm." One week later, while plaintiff was a patient at Henry Ford Hospital, medical staff amputated his right leg below the knee.

Plaintiff filed this lawsuit claiming that defendants were deliberately indifferent to his serious medical needs. Plaintiff originally sued the following defendants: the MDOC; Dr. Cotroneo; Lynn M. Larson, D.O. (a doctor at DWH), Terence Whiteman, M.D. (another doctor at DWH); and the entire medical staff at DWH (unknown parties). Defendants MDOC and Dr. Cotroneo have been dismissed. Plaintiff's remaining claim is that defendants Dr. Larson and Dr. Whiteman were deliberately indifferent to his serious medical needs while he was at DHW, which resulted in a post-surgical infection and the amputation.[2]

The Court previously summarized plaintiff's allegations. While some of plaintiff's allegations regarding dates and medical conclusions are not supported by the medical record, the Court will set forth the summary as a guide to plaintiff's claims in this case:

> Plaintiff complains that, for over 15 years, doctors within the MDOC had been aware of his problems with the circulation in his legs. He broadly alleges that unnamed persons disregarded the problems for years.
>
> On April 27, 2015, Dr. Cotroneo performed surgery at McLaren Hospital, placing a graft in Plaintiff's right groin to improve blood flow to Plaintiff's legs. The surgery had a number of complications, including a blood clot that moved toward Plaintiff's heart and ultimately caused a heart attack. Plaintiff alleges that the blood clot undoubtedly was the result of medications that he had been prescribed for years, of which Dr. Cotroneo should have known.
>
> Plaintiff was transferred to DWH on May 4, 2015, where he was placed under the care of Dr. Rashed Bashir, who is not a Defendant in the action. Plaintiff was discharged from DWH and returned to DRF-West on May 13 or 14, 2015. Over

[2] Plaintiff never identified the unknown medical staff. These unknown parties are subject to dismissal. *See* discussion in § III, *infra*.

the next two weeks, Plaintiff contracted MRSA, either in his cell or in the health care center at [DRF]-West. Plaintiff was readmitted at McLaren Hospital on May 31, 2015, and again placed under the care of Defendant Dr. Cotroneo. On June 2, 2015, Dr. Cotroneo operated to clean out the infected area. Dr. Cotroneo debrided the wound abcess and excised parts of the muscle areas to remove the pus and necrotic tissue. Dr. Cotroneo, however, did not remove the graft that was placed in April. Plaintiff alleges that Defendant Cotroneo should have known that the graft needed to be removed at that time.

Plaintiff was transferred to DWH and placed under the care of Defendant Dr. Larson from about June 15, 2015 to approximately August 3 or 4, 2015. Plaintiff claims that Dr. Larson visited him only 10 to 18 times during this period. He also alleges that, in an attempt to save money, Defendant Larson used a different kind of dressing and packed the wound, rather than using the type of dressing ordered by Dr. Cotroneo. Plaintiff began to bleed from his wound at about 8:30 p.m. on August 3 or 4, 2015. After he was cleaned up, the nurses were instructed to check on Plaintiff every hour, to ensure that he had not started to bleed again. Plaintiff alleges that he did not receive the necessary care and that Defendant Larson ignored signs of infection. Plaintiff was scheduled to be discharged from DWH on August 6, 2015.

On August 6, 2015, Plaintiff suddenly began to bleed profusely from a ruptured artery. He was rushed by ambulance to the Allegiance Health emergency room. Defendant Dr. Whiteman directed care during the transfer, and he had to place 80 pounds of weight on Plaintiff's groin area to control the bleeding. At Allegiance Health, Plaintiff was placed in the care of Dr. Praveen Balraj (not a Defendant), who performed surgery to remove the graft and the infection growing under the skin. However, because of the absence of sufficient blood flow, Dr. Balraj was forced to amputate Plaintiff's right leg below the knee.

Since the amputation, Plaintiff continues to experience problems. Unspecified persons have not adequately provided assistance with his prosthetic device and have denied pain relief. In addition, since arriving back at DRF-West, Dr. Scott Holmes (not a Defendant) has denied him an air mattress, despite the fact that Plaintiff was prescribed an air mattress at DWH. Plaintiff also is being denied a pillow to place under his stub and between his legs during sleep.

Plaintiff argues that Defendant Cotroneo should have removed the graft during the June 2, 2015, surgery and that Cotroneo therefore is responsible for Plaintiff's ultimate loss of his leg. He also asserts that the DWH and DRF-West Defendants should have known of his infection sooner, before it caused him to lose his right lower leg. Plaintiff further argues that Defendants DWH and DRF-West do not adequately clean their facilities and do not use bleach in those cleanings, leading to Plaintiff becoming infected with the MRSA virus. In addition, he contends that Defendant Larson caused his infection by not checking on him more frequently and by using an improper form of dressing.

> For relief, Plaintiff seeks compensatory damages in the amount of $750,000.00 and punitive damages of $850,000.00 from the individual Defendants and $5 million from the MDOC.

Opinion (ECF No. 17, PageID.90-92).

The Court construed plaintiff's claim as alleging deliberate indifference to a serious medical need in violation of the Eighth Amendment and ordered service of the complaint on defendants Dr. Larson and Dr. Whiteman. Both doctors have moved for summary judgment.

**II. Defendants' motion for summary judgment**

**A. Legal standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**B. Eighth Amendment claim**

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem*, Ohio, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

The gist of plaintiff's claim is that defendants Dr. Larson and Dr. Whiteman were deliberately indifferent in treating a post-surgical infection which resulted in the amputation of his right leg. It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth

Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley*, 475 U.S. at 319.

**C. Discussion**

**1. Chronology**

Defendants have set forth the following timeline which is supported by plaintiff's medical records[3]:

[3] Defendants filed 137 pages of plaintiff's medical records. *See* Medical Records (ECF No. 56-1). Portions of the medical record are explained in defendant Dr. Whiteman's Affidavit (ECF No. 54-3) and Dr. Larson's Affidavit (ECF No. 54-4).

In April 2015, plaintiff was a 61-year-old male, with a history of coronary artery disease, severe aortoiliac occlusive disease, and severe peripheral vascular disease. Medical Records (ECF No. 56-1, PageID.328). On April 27, 2015, plaintiff had elective surgery at McLaren Hospital, which he describes as "placing a graft into [his] right groin to improve blood flow." Compl. at PageID.5; Medical Records (ECF No. 56-1, PageID.323, 328 (describing procedure as "right femoral endarterectomy and profundoplasty with bovine patch, multiple stents from right common iliac to popliteal."). Plaintiff remained at McLaren Hospital until May 4, 2015, at which time he was discharged to DWH to continue his recovery. Compl. at PageID.5; Medical Records at PageID.328-341.

Within days of plaintiff's arrival at DWH, Rashed Bashir, M.D. adjusted his cardiac medications following a consultation with defendant Dr. Whiteman. Medical Records at PageID.342-346). On May 13, 2015, Dr. Bashir approved plaintiff's discharge back to the correctional facility. *Id.* at PageID.347-350. Plaintiff remained at facility until May 31, 2015, when his medical provider, Scott Holmes, M.D., sent him to the Carson City Hospital emergency room due to a possible infection at his surgical site. *Id.* at PageID.351.

Plaintiff was transferred to McLaren Hospital, where he remained hospitalized until June 15, 2015. *Id.* at PageID.352-362. At that time, plaintiff was discharged to DWH to continue his recovery. *Id.* at PageID.363-365.

Defendants Dr. Larson and Dr. Whiteman treated plaintiff at DWH from June 16, 2015 through August 6, 2015. Dr. Larson saw plaintiff on June 16, 2015, documenting that he had a "post op MRSA groin infection," that he had seen an infectious disease specialist at McLaren Hospital, that he would continue on intravenous antibiotics (Cubicin) for six weeks (through July 27, 2015), and that he was clinically stable. *Id.* at PageID.366-367. On that date, Dr. Larson wrote

orders for nursing staff to provide wound care as well as medication orders. *Id.* at PageID.368-369.

On June 17, 2015, Dr. Whiteman saw plaintiff, who had no complaints. *Id.* at PageID.370-372.

On June 18, 2015, Dr. Larson saw plaintiff and revised his wound care orders to provide more frequent dressing changes; plaintiff's pain was controlled and he had no concerns. Dr. Larson ordered labs and updated medication orders. *Id.* at PageID.373-379.

On June 23, 2015, plaintiff had an episode of acute diaphoresis and hypotension and advised Dr. Larson that this happens when he takes Coreg and Lisinipril too close together. Dr. Larson revised his Lisinipril order to state "please give at 1 pm; do not give with other bp meds," and ordered additional labs. *Id.* at PageID.380-386.

On June 26, 2015, Dr. Larson signed off on the dietitian's order for a regular diet for plaintiff. *Id.* at PageID.387. That same day, Dr. Larson saw plaintiff, who was not experiencing dizziness at that time but who reported dizziness with hypotension. Dr. Larson adjusted his medications. *Id.* at PageID.388-391.

On July 2, 2015, Dr. Larson reviewed plaintiff's lab results and modified his Coumadin dosage. *Id.* at PageID.392-394.

On July 6, 2015, Dr. Larson saw plaintiff again. He was not experiencing dizziness. Dr. Larson answered plaintiff's questions regarding the continued need for antibiotics and explained that they were "following recommendations." She modified his wound care orders again. *Id.* at PageID.395-398.

Between July 7 and July 20, 2015, Dr. Larson ordered labs, reviewed lab results, and adjusted medications. *Id.* at PageID.399-408.

On July 21, 2015, Dr. Larson saw plaintiff again, who advised that his wound was healing nicely. He was able to ambulate in the halls and had no dizziness or lightheadedness. She revised his wound care orders and medication orders again. She also submitted a Consultation Request for plaintiff to have a follow-up visit with his surgeon (i.e., "follow up post visit from complication from surgery"). *Id.* at PageID.409-416.

On July 24, 2015, Keith Papendick, M.D. approved the follow-up visit with the surgeon, and Dr. Larson ordered labs and adjusted medications on that date as well. *Id.* at PageID.417-420.

On July 27, 2015, Dr. Larson saw plaintiff again and noted that, following recommendations, his course of antibiotics would be complete on July 28, 2015. *Id.* at PageID.421-423.

On July 30, 2015, Dr. Larson ordered labs. *Id.* at PageID.424.

On August 2, 2015, Janet Wright, R.N. documented that she had observed gray/green drainage from Mr. Raper's wound during his dressing change and indicated, "Noted on MSP board for physician review on 8/3/15." *Id.* at PageID.425.

On August 3, 2015, Sarah Brouwer, R.N. documented that plaintiff had "started to bleed from groin incision site, called for nursing, upon entering room there was large amounts of blood on the floor and on the inmate, direct pressure was applied for 10 mins." She notified the provider on call, NP Wierman, who directed her to "keep an eye on the site for 4 hours to make sure there is no internal hematoma, and to place it on the doctor board as well for NP Alford to see in the AM." Ms. Brouwer continued to monitor plaintiff as directed. *Id.* at PageID.426-429.

On August 5, 2015, Danielle Alford, P.A. saw plaintiff and noted that he had an open wound covered in gauze. She discontinued his PICC line and revised his wound care orders.

*Id.* at PageID.430-432.

Later that day, plaintiff was walking back from the day room and reported that he was bleeding from his groin. Hospital staff helped plaintiff back to his bed and applied direct pressure to the wound. Dr. Whiteman noted that plaintiff's arterial bypass graft and wound was healing very well, and that plaintiff's groin suddenly started bleeding when he was walking out of the dayroom. The doctor "established control over the bleeding" with 80 pounds of pressure. After placement of an IV and two crystalloid infusions, Dr. Whiteman ordered plaintiff transported to the Allegiance Health emergency room and directed care throughout the transport. *Id.* at PageID.433-434.

On August 6, 2015, plaintiff was admitted to Henry Ford Hospital in Detroit. An emergency "right groin wound exploration" occurred on that date. Plaintiff's diagnosis was "infected right groin pseudoaneurysm." Dr. Whiteman Aff. at PageID.309; Medical Records at PageID.435-439.

On August 13, 2015, plaintiff underwent an above-the-knee amputation of his right leg. *Id.*

On August 17, 2015, Henry Ford Hospital discharged plaintiff back to DWH. Medical Records at PageID.440-443.

**2. Dr. Larson and Dr. Whiteman's post-surgical treatment**

Dr. Larson and Dr. Whiteman acknowledge that, "Mr. Raper's above-the-knee right leg amputation occurred due to complications that arose from an infection he had following surgery." Defendants' Brief (ECF No. 74, PageID.595). The issue for the Court is whether plaintiff has established both the objective and subjective components of his Eighth Amendment claim against these defendants. In addressing this issue, the Court has reviewed plaintiff's

response (ECF No. 78) and his four "declarations" (ECF Nos. 79, 80, 81, and 82). While plaintiff refers to his statements as "declarations," they are neither unsworn declarations under penalty of perjury pursuant to 28 U.S.C. § 1746 nor affidavits. Rather, they contain arguments and, in some cases, rhetorical questions.[4] Nevertheless, plaintiff's declarations set forth his position in this litigation.

**a. Objective component**

Based on his filings, plaintiff contends that while defendants attended him at DWH, they delayed treating his infection until he required an amputation. The Court construed plaintiff's complaint as alleging that "[d]efendants should have known of his infection sooner, before it caused him to lose his right lower leg" and that "Defendant Larson caused his infection by not checking on him more frequently and by using an improper form of dressing." *See* Opinion (ECF No. 17, PageID.92). Plaintiff elaborated on his claims in his responses (declarations) to defendants' motion for summary judgment. Plaintiff stated that he complained to each nurse about the antibiotic Cubicin and the ill effects he was having while on it ("muscle weakness, breathing, etc.") and that nurses at DWH told him that Dr. Larson "was not following what M.D. Joseph Cotroneo, instructed them to do." Plaintiff's First Declaration (ECF No. 80, PageID.651-652). Plaintiff stated that defendants Dr. Larson and Dr. Whiteman did not follow Dr. Cotroneo's orders, that he complained about the anti-biotic Cubicin while at DWH, and that he has been told that an individual can reject Cubicin and develop infections. Plaintiff's Second Declaration (ECF No. 81, PageID.654-656). Plaintiff also stated that he was supposed to have follow-up appointments with Dr. Cotroneo, and that if defendants Dr. Larson and Dr. Whiteman had "done all of these blood

[4] Plaintiff also filed a sur-reply (ECF No. 88) with a supplemental brief (ECF No. 89) contrary to W.D. Mich. LCivR 7.2(c), which allows further briefing when permitted or required by the Court. Plaintiff did not seek leave to file a sur-reply and the Court did not ask him to provide one. Accordingly, the Court will disregard the sur-reply and supplemental brief as improvidently filed.

draws in which they claim they had done," neither of them "was competent enough to catch the tell, tell signs, that I was still infected." Plaintiff's Third Declaration (ECF No. 82, PageID.662). Plaintiff has presented no evidence to support his claims.

Defendants contend that plaintiff's Eight Amendment claim fails because he did not present verifying medical evidence to demonstrate the detrimental effect of the alleged delay in treating his infection. In reviewing a claim of delayed treatment, the Court looks to *Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001), which "held that an inmate who complains that a delay in medical treatment is 'sufficiently serious' so as to violate his constitutional rights, must present 'verifying medical evidence' to establish the detrimental effect of the delay in medical treatment." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 894 (6th Cir. 2004) (summarizing and applying the rules set forth in *Napier*). The verifying evidence requirement is used to establish the objective prong of a deliberate indifference claim. *See Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) ("We explained in *Blackmore* that verifying medical evidence of an exacerbated injury was necessary to establish the objective prong for 'minor maladies or non-obvious complaints of a serious need for medical care'.") (citing *Blackmore*, 390 F.3d at 898 and *Napier*, 238 F.3d at 742).

Here, plaintiff's deliberate indifference claim can be construed as one involving delayed treatment, specifically that defendants' delay in treating his infection resulted in a hemorrhage and subsequent amputation of his lower right leg. However, plaintiff has not provided verifying medical evidence to support his claim. It appears that plaintiff attempted to obtain verifying evidence from Dr. Cotroneo during the doctor's deposition. *See* Dr. Cotroneo Dep. (ECF No. 74-1). However, Dr. Cotroneo did not provide such evidence.

When questioned by defendants' counsel, Dr. Cotroneo expressed no opinion that delay in treatment is what caused the amputation:

> Q. When you saw Mr. Raper on March 13, 2017, did you form any opinions as to what circumstances led to the above the knee amputation of his right leg on August 13th, 2015?
>
> A. Okay. The last time I saw him prior to his amputation was for wound debridement and he had an infected wound in that groin.
>
> Q. Was that June 2015?
>
> A. Yes.
>
> Q. So when you next saw him more than a year and a half after his amputation, at that time did you form an opinion of what led to the amputation?
>
> A. I didn't have the whole details [sic], but it's not too hard to figure out. With a wound infection with a patch in place, patch dehiscence is unfortunately a complication of that which could be life threatening or limb threatening.
>
> Q. Did you form any opinions on March 13th, 2017 about the adequacy of care that Mr. Raper received between his discharge from McLaren on June 15th, 2015 and his amputation?
>
> A. No. No. I had no data on that.
>
> Q. Has Mr. Raper retained you as an expert witness?
>
> A. No.

Dr. Controneo Dep. (ECF No. 74-1, PageID.606-607).

When plaintiff questioned Dr. Cotroneo about whether visiting him before the amputation would have saved plaintiff's leg, the doctor expressed an opinion that the leg would have been amputated eventually due to the extent of plaintiff's arterial disease, commenting that the infection "might have precipitated it quicker":

> Q. Doc, would you feel that if you'd had the opportunity if I'd have been brought back down there in the time frame in which you requested, did you feel that maybe there could have been a procedure done that the leg may have not had to have been amputated due to the infection?

> A. It would be unlikely that you would not have ended up with an amputation sometime. The problem of the infection kind of precipitated it much faster, but your prognosis with the amount of arterial disease you had in that right leg is -- the five-year limb salvage is not very good. So eventually I think you would have had an amputation on that leg no matter what. Now, it might have precipitated it quicker with the infection, though.
>
> Q. Okay.
>
> A. And once you have an infection with a patch in there like you had I'm assuming you had a patch dehiscence with a massive bleed; is that correct?
>
> Q. I believe so, yes.
>
> A. That's life threatening and unfortunately with your disease once that happens, doing -- tying off that area and bypassing that area, your vessels distally were not good vessels for a bypass. So once you had a major dehiscence like that, which is the patch leaking massive amounts of blood, that kind of sealed it.
>
> Q. Okay.
>
> A. So I was not surprised to hear that you had an amputation.

Dr. Cotroneo Dep. (ECF No. 74-1, PageID.608-609).

Dr. Cotroneo's testimony does not provide verifying medical evidence that defendants' alleged delay in treating the infection caused the amputation. Dr. Cotroneo expressed no opinion that defendants' actions caused or exacerbated the infection, that defendants failed to follow his instructions, or that a follow-up examination with him would have prevented the amputation. Rather, given the extent of plaintiff's arterial disease and the nature of the procedure, the doctor "was not surprised" to hear that plaintiff had an amputation. Plaintiff has not established the objective prong of his Eighth Amendment claim based on his claim of delayed treatment. Accordingly, defendants Dr. Larson and Dr. Whiteman's motion for summary judgment should be granted.

**b. Subjective component**

Even if the Court construes plaintiff's claim as not involving delayed treatment, *i.e.*, that plaintiff had a serious medical need in the form of a post-operative infection, plaintiff's claim fails because he has not established the subjective component. Defendants were aware of plaintiff's infection and treated him for it. Plaintiff's treatment included antibiotics for six weeks, monitoring his wound, changing dressings on his wound, lab tests, and medications to treat his other medical conditions. As discussed, plaintiff's medical records reflect that defendants Dr. Larson and Dr. Whiteman and the medical staff at DWH monitored plaintiff's condition and provided medical treatment on a regular basis. There is no evidence that defendants ignored plaintiff's medical condition or exhibited "obduracy and wantonness" in treating him. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Plaintiff's disagreement with his physicians over the proper course of treatment "alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017).

Plaintiff is understandably upset, if not traumatized, at the loss of his leg; anyone would be. However, plaintiff's dissatisfaction with the outcome of his treatment is insufficient to support a claim of deliberate indifference. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106. Plaintiff has not established the subjective prong of his deliberate indifference claim. Accordingly, defendants Dr. Larson and Dr. Whiteman's motion for summary judgment should be granted.

**III. Unknown parties**

Finally, plaintiff sues unknown parties identified only as the "entire medical staff at the Duane L. Waters Health Center." Compl. at PageID.1. An unknown party or "Doe" defendant listed in a complaint is not a party to a lawsuit. Rather, "Doe defendants are routinely used as stand-ins for real parties until discovery permits the intended defendants to be installed." *Hindes v. FDIC*, 137 F.3d 148, 155 (3rd Cir. 1998) (internal quotation and citation omitted). Plaintiff has not identified the "unknown parties." Discovery is closed. Accordingly, plaintiff's claims against these unknown parties should be dismissed.

**IV. Recommendation**

For these reasons, I respectfully recommend that defendants' motion for summary judgment (ECF No. 74) be **GRANTED**, that the "unknown parties" be **DISMISSED**, and that this case be **TERMINATED**.

Dated: February 27, 2020

/s/ Ray Kent
RAY KENT
United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).